# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2026

Lyle W. Cayce
Clerk

No. 25-20475

IN THE MATTER OF SOURCEWATER, INCORPORATED,

*Debtor*,

JOSHUA ADLER,

*Appellant*,

*versus*

ENERGY DEBT HOLDINGS L.L.C.,

*Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-2381

_____

Before SMITH, WILLETT, and RAMIREZ, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Joshua Adler petitioned the bankruptcy court to declare that his note has payment priority over another note. The bankruptcy court dismissed his suit, holding that his claims were judicially estopped because his predecessor in interest, in a previous proceeding, had stated that the other note had priority. Adler appeals the district court's judgment affirming the bankruptcy court. We AFFIRM.

No. 25-20475

I

On March 17, 2023, Sourcewater, Inc. ("Debtor"), filed a voluntary petition for Chapter 11 bankruptcy. The priority of two loans was in dispute. The first is dated May 16, 2020, between the Small Business Administration and Debtor (the "SBA Note"); the second is dated December 22, 2021, between Energy Debt Holdings LLC ("EDH") and Debtor (the "EDH Note").

On May 1, 2023, the bankruptcy court entered a Final Cash Collateral Order that validated EDH's secured claim. The order also barred any "adversary proceeding or contested matter . . . challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the EDH Loan" filed after June 15, 2023. No challenge was filed by this date.

On November 3, 2023, the bankruptcy court held a hearing on the proposed Second Amended Plan that gave payment priority to the SBA Note for the proceeds from the sale of Debtor's assets. EDH opposed the plan, asserting that the EDH Note had payment priority. After EDH presented its argument, counsel for SBA informed the bankruptcy court that SBA had filed its UCC-1 Statement in the wrong jurisdiction and that the SBA Note was "the second position" behind the EDH Note. The parties then agreed to, and the district court issued, a Confirmation Order in which the EDH Note had "first priority."

Adler acquired the SBA Note in February 2024. On March 27, 2024, he filed this adversary proceeding seeking a declaratory judgment that the SBA Note is senior in payment priority to the EDH Note. Adler also sought payment of the SBA Note by EDH from the proceeds EDH received from the sale of Debtor's assets in the underlying bankruptcy case.

EDH moved to dismiss Adler's complaint with prejudice. The bank-

ruptcy court granted the motion, holding that Adler was estopped from asserting that the SBA Note had priority over the EDH Note because of the statements by SBA's counsel conceding that the EDH Note had priority.

Adler appealed to the district court, which affirmed on alternate grounds. First, it held that Adler's claim was barred by the Cash Collateral Order because it challenged the priority of the EDH Note and was filed after June 15, 2023. Second, it held that Adler's claim was independently barred by the Confirmation Order because that order provided that the EDH Note had first priority. Adler appeals.

## II

"Because this appeal arises from a district court order affirming the final judgment of a bankruptcy court, we apply the same standard of review as did the district court." *Matter of Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). "That is, we review the bankruptcy court's factual findings for clear error, and we review legal conclusions and mixed questions of fact and law *de novo*." *Id.* (citation modified). We interpret the terms of a confirmation order *de novo*. *In re Davis Offshore, L.P.*, 644 F.3d 259, 263 (5th Cir. 2011) (citing *In re Nat'l Gypsum Co.,* 219 F.3d 478, 484 (5th Cir. 2000)).

## III

The Confirmation Order provided that the EDH Note had priority over the SBA Note. It preserved a right for parties to assert claims only "to the extent that such rights were preserved consistent with the [Cash Collateral Order]." But Adler's suit is precluded by the Cash Collateral Order. The order barred any "adversary proceeding or contested matter . . . challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the EDH Loan" filed after June 15, 2023. Adler's suit is an adversary proceeding challenging the priority of the EDH

No. 25-20475

Loan.  Because this suit was filed after June 15, 2023, it is barred.[1]

The judgment of the district court, affirming the bankruptcy court, is AFFIRMED.

_____

[1] Because Adler's claims are barred by the Cash Collateral Order and Confirmation Order, we do not decide whether judicial estoppel independently bars his claims.

No. 25-20475

DON R. WILLETT, *Circuit Judge*, concurring:

I join the court's opinion in full. I write separately because the bankruptcy court's reliance on judicial estoppel raises an antecedent question—one that logically comes first but has largely gone unasked: By what authority do federal courts wield judicial estoppel in its modern form?

JUSTICE THOMAS recently questioned the doctrine's pedigree.[1] His doubt is well taken. Judicial estoppel was unknown at the Founding, surfaced in state law decades later, and then spread rapidly through the federal courts without any settled account of its source or limits. Today it carries formidable, sometimes claim-ending force, letting judges extinguish claims because a litigant once took an inconsistent legal position elsewhere. Courts have every reason to resist such gamesmanship. But the impulse to police it does not itself confer judicial authority.

Fortunately, this case requires no exercise of that putative authority. The Cash Collateral and Confirmation Orders foreclose Adler's claim, so judicial estoppel is beside the point. Ordinary law resolves this dispute. But it does not resolve the antecedent question: Where does judicial estoppel's power come from? I have searched and come up empty.

Four points follow. First, judicial estoppel is a recent doctrine with unsettled boundaries. Second, none of its three asserted sources—equity, inherent power, or common law—supports the doctrine in its modern federal form. Third, that missing warrant carries serious structural consequences. Fourth, this case illustrates why courts should not summon an uncertain doctrine to do work that ordinary law already does.

---

[1] *See Keathley v. Buddy Ayers Constr., Inc.*, 146 S. Ct. 1532, 1540 (2026) (THOMAS, J., concurring).

No. 25-20475

## I. Judicial Estoppel is a Recent Doctrine with Unsettled Boundaries

Judicial estoppel came late to federal law, and it arrived by way of the states. In its usual form, it prevents a party from pressing a position at odds with one it took in an earlier proceeding.[2]

Though simple to state, the doctrine can have substantial reach. A court may bar a party from contradicting a sworn factual assertion, pressing a legal theory incompatible with one advanced before, or reviving a defense abandoned in earlier litigation.[3] At its outer edge, judicial estoppel can foreclose an entire claim.[4]

Stakes that serious raise a basic pedigree question: Where did judicial estoppel come from? Not from the Founding. Not from the English courts of equity. Not from the common law administered by the earliest federal courts. The first identified decision came instead in *Hamilton v. Zimmerman*, decided by the Tennessee Supreme Court in 1857.[5] Even a century later, judicial estoppel remained "the minority viewpoint which ha[d] encountered

---

[2] *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (citation omitted). Along with inconsistency, courts also consider two other factors: success and unfair advantage. *Id.* at 750–51.

[3] *See, e.g.*, *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006); *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997).

[4] *See, e.g.*, *New Hampshire*, 532 U.S. at 749, 756 (holding that New Hampshire was "barred from asserting—contrary to its position in the 1970's litigation—that the inland Piscataqua River boundary runs along the Maine shore," which led to the Court granting Maine's motion to dismiss the complaint); *Cannon-Stokes*, 453 F.3d at 449 (holding that judicial estoppel barred the debtor's employment-discrimination claim after she failed to list the claim in her bankruptcy schedules, which led to the court affirming the dismissal of her claim).

[5] 37 Tenn. (5 Sneed) 39 (1857).

inhospitable reception outside the State of Tennessee."[6] As late as 1980, the D.C. Circuit declined to adopt it because it "ha[d] not been followed by anything approaching a majority of jurisdictions, nor [was] there a discernible modern trend in that direction."[7]

Only in recent decades did judicial estoppel take hold in the federal courts of appeals. Every circuit now recognizes some version of it.[8] But agreement largely ends there, as the circuits divide over whether the doctrine reaches legal as well as factual positions, what considerations govern its application, and whether state or federal law supplies the rule.[9]

The result is uniform adoption without uniform doctrine. Judicial estoppel has expanded rapidly, recently, and entirely through judicial decision—while its source and scope remain unsettled. That combination should give us pause and direct the inquiry to the doctrine's legal foundation.

---

[6] *Parkinson v. Cal. Co.*, 233 F.2d 432, 437–38 (10th Cir. 1956).

[7] *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980).

[8] *E.g.*, *Perry v. Blum*, 629 F.3d 1, 8 (1st Cir. 2010); *Clark v. All. Acquisition, LLC*, 886 F.3d 261, 266 (2d Cir. 2018); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358–59 (3d Cir. 1996); *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996); *In re Coastal Plains, Inc.*, 179 F.3d 197, 204 (5th Cir. 1999); *Reynolds v. Comm'r*, 861 F.2d 469, 472, 474 (6th Cir. 1988); *Cannon-Stokes v. Potter*, 453 F.3d 446, 447–48 (7th Cir. 2006); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006); *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 992–93 (9th Cir. 2012); *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007); *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc); *Marshall v. Honeywell Tech. Sys., Inc.*, 828 F.3d 923, 931 (D.C. Cir. 2016); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996).

[9] *See generally* Kira A. Davis, Note, *Judicial Estoppel and Inconsistent Positions of Law Applied to Fact and Pure Law*, 89 Cornell L. Rev. 191, 202–08 (2003) (surveying circuit split on the scope of the doctrine); Nicole C. Frazer, Note, *Reassessing the Doctrine of Judicial Estoppel: The Implications of the Judicial Integrity Rationale*, 101 Va. L. Rev. 1501, 1513–19 (2015) (surveying circuit split on whether state or federal law applies).

No. 25-20475

## II. None of the Asserted Sources Supports Modern Judicial Estoppel

Courts have offered several reasons for judicial estoppel: protecting the sanctity of oaths, preserving the integrity of the judicial process, and preventing unfairness.[10] Those reasons, however, explain what the doctrine is meant to accomplish, not the antecedent question of what legal authority permits courts to use it. Nor do those concerns reveal an obvious gap, because familiar doctrines with recognized sources and limits already address each of them—perjury law, contempt and sanctions, equitable estoppel, and judicial admissions.[11] The inquiry must therefore move from purpose to source.

The search thus narrows to three possible sources: equity, inherent power, and common law. None explains the doctrine in the form federal courts now employ.

---

[10] *Hamilton*, 37 Tenn. (5 Sneed) at 48 (invoking the sanctity of oaths); *New Hampshire*, 532 U.S. at 749–50 (invoking the integrity of the judicial process); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982) (same); *In re Coastal Plains*, 179 F.3d at 205 (rejecting fairness to the litigants as the doctrine's purpose); *see also* Frazer, *supra*, at 1509.

[11] Perjury statutes address false sworn statements. 18 U.S.C. §§ 152, 1621. Contempt and sanctions protect the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Equitable estoppel addresses reliance-based unfairness. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000). And judicial admissions bind formal concessions made in the litigation itself. *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476–77 (5th Cir. 2001). Each doctrine carries defined limits—proof beyond a reasonable doubt for perjury, a misconduct finding for contempt and sanctions, reliance and prejudice for equitable estoppel, and a clear and unequivocal statement for judicial admission. *See In re Winship*, 397 U.S. 358, 364 (1970); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107–08 (2017); *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 & n.10 (1984); *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995).

No. 25-20475

## A. Equity Supports, at Most, a Narrow Core of Judicial Estoppel

Courts most often locate judicial estoppel in equity, treating it as a means of preventing fraud or abuse of the judicial process.[12] That label has intuitive appeal, but it does not answer the harder question of authority. To be sure, equity may withhold relief from a litigant who manipulates proceedings for advantage. Yet calling judicial estoppel "equitable" does not make it so. A doctrine that forecloses a position—or an entire claim—must rest on a recognized source of judicial power.

The Supreme Court has stressed that "equitable authority is not freewheeling" and requires "a [F]ounding-era antecedent."[13] That command makes the inquiry historical rather than aspirational: Did Founding-era equity include anything with the defining features of modern judicial estoppel? No such analogue has been identified.

The historical record begins with the Founding, when equity under Article III was hotly contested. The Anti-Federalists feared unbounded judicial discretion.[14] The Federalists responded that judges would remain

---

[12] *See, e.g.*, *Clark*, 886 F.3d at 266 ("We take it as axiomatic that judicial estoppel—an equitable doctrine—is to be construed in light of equitable principles."); *Reynolds*, 861 F.2d at 472 ("Judicial estoppel has been viewed as an equitable doctrine governed by general equitable principles.").

[13] *Trump v. CASA, Inc.*, 606 U.S. 831, 841, 847 (2025).

[14] *See, e.g.*, Federal Farmer, Letter XV (Jan. 18, 1788), *reprinted in* 2 THE COMPLETE ANTI–FEDERALIST 315, 322 (H. Storing ed. 1981) (criticizing Article III's extension of the judicial power to "Cases in . . . Equity" as "giv[ing] the judge a discretionary power"); Brutus, Essay XI (Jan. 31, 1788), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST, *supra*, at 417, 419–20 (fearing that discretionary equitable power would permit courts to "explain the [C]onstitution according to the reasoning spirit of it, without being confined to the words or letter," leading to the "entire subversion of the legislative, executive and judicial powers of the individual states").

bound by rules and precedent,[15] with Hamilton assuring that equity would operate only in "extraordinary cases."[16] That understanding carried into the Judiciary Act of 1789, which conferred "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception."[17] Federal equity thus followed English practice,[18] and that practice was bounded by settled principles.[19]

Against that backdrop, the absence of a historical analogue is telling: no Founding-era doctrine had the defining features of modern judicial

---

[15] THE FEDERALIST NO. 78, at 471 (Clinton Rossiter ed., 1961) (Alexander Hamilton) (reassuring the Anti-Federalists that federal courts would be "bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them").

[16] *See* THE FEDERALIST NO. 83, at 505 (Alexander Hamilton) (recognizing that the limited function of equity was "to give relief *in extraordinary cases*" only, "which are *exceptions* to general rules" that would otherwise bind courts).

[17] *CASA*, 606 U.S. at 841 (citation omitted); *see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (recognizing that "[t]he 'jurisdiction' thus conferred" by the Judiciary Act of 1789 "is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries") (citation omitted)); *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945) ("The suits in equity of which the federal courts have had 'cognizance' ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery."); *see also Boyle v. Zacharie,* 31 U.S. (6 Pet.) 648, 658 (1832) (STORY, J.) (emphasizing the Court's "settled doctrine" that "remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country"); *Payne v. Hook*, 74 U.S. (7 Wall.) 425, 430 (1869) ("The equity jurisdiction conferred on the Federal courts is the same that the High Court of Chancery in England possesses[.]").

[18] *E.g.*, *Robinson v. Campbell*, 16 U.S. (3 Wheat.) 212, 213, 221–23 (1818).

[19] 3 WILLIAM BLACKSTONE, COMMENTARIES *440–41 (observing that "the system of relief administered by a court of equity" had been perfected "into a regular science"); *see also Missouri v. Jenkins*, 515 U.S. 70, 130 (1995) (THOMAS, J., concurring) ("[I]t should come as no surprise that there is no early record of the exercise of broad [equitable] powers.").

estoppel. England's High Court of Chancery—the benchmark for federal equity—recognized nothing like it.[20] English courts did recognize equitable estoppel, but it required a representation, reliance, and resulting harm.[21] Its focus is the *party* misled.[22]

Judicial estoppel operates differently. It may bar a position—or an entire claim—even when the opposing party played no part in the first proceeding, heard no misrepresentation, and relied on nothing.[23] The contrast is fundamental: equitable estoppel protects the party misled, whereas judicial estoppel protects the institution offended. No historical analogue has been identified for that nonrelational form.

The preclusion doctrines sharpen the contrast further. Claim and issue preclusion derive from judgments and operate through settled rules governing the parties, claims, and issues those judgments affect. By contrast, judicial estoppel assigns a separate consequence to a prior position— sometimes one never adjudicated—under standards that vary from court to

---

[20] Neither the cases nor commentary offered in support of judicial estoppel identifies a Founding-era analogue possessing the defining features of the modern doctrine.

[21] *E.g.*, *Hobbs v. Norton* (1682), 1 Vern. 136, 23 E.R. 370 (Ch.); *Gale v. Lindo* (1687), 1 Vern. 475, 23 E.R. 601 (Ch.); *Hunsden v. Cheyney* (1690), 2 Vern. 150, 23 E.R. 703 (Ch.); *Raw v. Potes* (1691) 2 Vern. 239, 21 E.R. 759 (Ch.); *Montefiori v. Montefiori* (1762), 1 Bla. W. 363, 96 E.R. 203 (K.B.); *see also Konstantinidis*, 626 F.2d at 937 (distinguishing equitable estoppel "from the more obscure concept of 'judicial estoppel'").

[22] *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1348 (5th Cir. 1996) ("[E]quitable estoppel responds to the unfairness inherent in denying the claimant some benefit after it has reasonably relied on the misrepresentations of the adverse party.").

[23] *Keathley*, 146 S. Ct. at 1541 (THOMAS, J., concurring); *see also In re Flugence*, 738 F.3d 126, 129 (5th Cir. 2013) ("Judicial estoppel has three elements: (1) The party against whom it is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.").

court. Preclusion carries its warrant and its limits together; judicial estoppel borrows the stopping power without the same foundation.

The Supreme Court's decision in *New Hampshire v. Maine* does not bridge the gap between that narrow equitable tradition and judicial estoppel's broad modern use. The Court applied the doctrine without locating its source in Article III or traditional equity. Moreover, the case arose in original jurisdiction, between the same sovereign parties that had litigated the earlier dispute.[24] New Hampshire had benefited from its earlier position, while Maine had relied on and acquiesced in it.[25] In that respect, the case looks much like equitable estoppel.

The authorities cited in *New Hampshire* carry the doctrine no further than that reliance-inflected core. Its principal case—*Davis v. Wakelee*[26]—is commonly understood as an equitable-estoppel decision.[27] That case, too, involved the same opposing party and reliance on the earlier position.[28] *New Hampshire* may therefore mark judicial estoppel's narrow core, but it does not explain the doctrine's use across unrelated proceedings, without reliance, and sometimes to wipe out an entire claim.

_____

[24] 532 U.S. at 745, 747–49.

[25] *Id.* at 754–55.

[26] 156 U.S. 680 (1895).

[27] *See, e.g.*, *Keathley*, 146 S. Ct. at 1542 n.4 (THOMAS, J., concurring) ("*Davis* does not appear to be a judicial-estoppel case."); *Edwards*, 690 F.2d at 598 (describing *Davis* as an equitable estoppel decision); *see also* Frazer, *supra*, at 1504 & n.8 ("[M]ultiple scholars and courts believe that judicial estoppel was not the type of estoppel at issue [in *Davis*.]"). The *Davis* Court framed the problem as unfairness to the opposing party, not injury to the judiciary. 156 U.S. at 691.

[28] *Compare Davis*, 156 U.S. at 685–86, 689–91 (describing how Wakelee had relied on and acquiesced in Davis's earlier position), *with New Hampshire*, 532 U.S. at 754–55 (describing how Maine had relied on and acquiesced in New Hampshire's earlier position).

No. 25-20475

Equity therefore explains, at most, this narrow core—not the modern doctrine. The chronology confirms the point: the first reported case appeared in state court 70 years after the Constitution's ratification, and the federal cases arrived much later. That timing matters, because a doctrine that "lacks a historical pedigree . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act."[29] *New Hampshire* never grounded the doctrine's broader reach in traditional equity. If the doctrine has a broader foundation, it must lie elsewhere.

## B. Inherent Power Does Not Extend This Far

If equity cannot bear the doctrine's modern weight, inherent power is the next possible source. It is the authority courts use to punish contempt, dismiss for failure to prosecute, award fees for bad faith, and vacate judgments procured by fraud.[30] Judicial estoppel is defended in the same terms: courts must be able to stop a litigant from telling one judge one thing and another judge the opposite.[31]

To be sure, inherent power predates the Constitution.[32] English courts punished contempt, dismissed vexatious suits, and regulated practice without legislative authorization.[33] But that English practice did not cross the

---

[29] *CASA*, 606 U.S. at 847 (citing *Grupo Mexicano*, 527 U.S. at 318–19).

[30] *E.g.*, *Chambers.*, 501 U.S. at 46–51; *Link v. Wabash R.R.*, 370 U.S. 626, 629–30 (1962); *see also Dietz v. Bouldin*, 579 U.S. 40, 45–48 (2016) (recognizing inherent procedural authority only when reasonable and consistent with governing statutes and rules); *Degen v. United States*, 517 U.S. 820, 828–29 (1996) (rejecting an unnecessarily blunt, claim-dispositive use of inherent power).

[31] *See New Hampshire*, 532 U.S. at 749.

[32] Charles M. Yablon, *Inherent Judicial Authority: A Study in Creative Ambiguity*, 43 Cardozo L. Rev. 1035, 1051 (2022).

[33] *See id.* at 51–61; *see also* 3 Blackstone, *supra*, *295–96 (discussing other inherent powers).

Atlantic wholesale; the Founding-era conception was considerably narrower.[34]

The early Supreme Court adopted that narrower conception. When it recognized inherent judicial authority in 1812, it spoke only of powers "necessary to the exercise of all others," including contempt and the power to "enforce the observance of order."[35] Necessity—not convenience—was the touchstone. Accordingly, the early Court deferred to Congress when a claimed power reached beyond the immediate work of adjudication.[36] Nor did it ever recognize a freestanding authority to bar a claim because the litigant had taken a different position elsewhere.

The inherent powers the Court *did* recognize share a defining feature: each keeps a court's own house in order by addressing defiance of its commands, fraud on the court, failure to appear or comply.[37] JUSTICE BARRETT's scholarship identifies the same limited set—contempt, dismissal for failure to prosecute, vacatur for fraud, and fee sanctions for bad faith—each "concerned with the regulation of court processes."[38]

---

[34] *See* Yablon, *supra*, at 1051–61 (describing the Founding generation's ambiguous and narrow conception of federal judicial authority as a product of considered compromise rather than an affirmative grant of freestanding common-law power).

[35] *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812).

[36] *See, e.g.*, *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 n.1 (1799) (CHASE, J.) ("[T]he political truth is that the disposal of the judicial power (except in a few specified instances) belongs to [C]ongress."); *see also* Yablon, *supra*, at 1062–71.

[37] *See generally* Jeffrey C. Dobbins, *The Inherent and Supervisory Power*, 54 GA. L. REV. 411, 434–39 (2020) (cataloguing the recognized categories of inherent sanctions power).

[38] *See* Amy Coney Barrett, *Procedural Common Law*, 94 VA. L. REV. 813, 831, 845 (2008) (distinguishing court-specific inherent authority from uniform rules of general application). Judicial estoppel fits neither model: courts apply it as a generally applicable federal doctrine, yet it lacks the settled content such a doctrine ordinarily possesses.

Measured against that tradition, modern judicial estoppel fits awkwardly. It may operate without culpability, injury, or necessity.[39] Even so, its consequence can be sweeping: bar the position and, sometimes, bury the claim with it.[40] A rule with those features is not a sanction calibrated to the misconduct and harm before the court.

The strongest response is that inherent power may reach beyond a single case "to prevent 'improper use of judicial machinery.'"[41] That rationale may explain the narrowest applications, but it cannot carry the modern doctrine. Inherent power rests on necessity and is bounded by proportionality; modern judicial estoppel often lacks both. A later court may dispose of a claim because of conduct in another proceeding, without tying that result to any need in the case before it. Yet misconduct in the earlier case can be met there with sanctions directed at the culpable conduct and resulting harm, while comity ordinarily counsels coordinate courts against managing one another's affairs.[42]

Nor does a general power to preserve the judiciary's consistency fit with *Hudson & Goodwin*, which refused to infer authority merely because it might help the judiciary "preserve its own existence."[43]

---

[39] *Cf.* Dobbins, *supra*, at 434–39 (2020) (describing the targets of inherent powers like sanctions).

[40] *See Keathley*, 146 S. Ct. at 1544 (SOTOMAYOR, J., concurring) ("Judicial estoppel, by contrast, provides one remedy and one remedy only: dismissal of the tort claim.").

[41] *New Hampshire*, 532 U.S. at 750 (citation omitted).

[42] *See Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (explaining that comity requires coordinate federal courts to avoid interfering with one another's proceedings).

[43] *See* 11 U.S. (7 Cranch) at 33–34 (rejecting an implied power grounded in self-preservation).

The point can be stated simply: inherent power is strongest when local, necessary, and tailored, while judicial estoppel in its broad, cross-proceeding form is often none of the three. With equity and inherent power exhausted, only common law remains.

## C. Common Law Supplies No General Federal Warrant

The final candidate fares no better as a general explanation.

Classical common law drew its force from longstanding, widely shared custom.[44] Judicial estoppel, by contrast, has no comparable pedigree. A doctrine that appeared late, met resistance for more than a century, and remains disputed at its core is difficult to describe as immemorial law.

One might still argue that state law supplies one rule of judicial estoppel, and federal procedural common law another.[45] But *Erie Railroad Co. v. Tompkins* supplies a choice-of-law framework, not a uniform federal warrant.[46] Under that framework, a federal court sitting in diversity applies

---

[44] *See* 1 BLACKSTONE, *supra*, at *64 (explaining that the common law derives its authority from "long and immemorial usage" and "universal reception"); Joshua C. Macey, Ketan Ramakrishnan, & Brian M. Richardson, *Against General Law Constitutionalism*, 93 U. CHI. L. REV. 621, 625 (2026) (explaining that general common law rests on a customary, cross-jurisdictional pedigree developed by state courts, legislatures, and other non-federal actors over time, not on the unilateral say of the tribunal applying it); Micah S. Quigley, *Article III Lawmaking*, 30 GEO. MASON L. REV. 279, 290 (2022) ("[C]ommon-law judging was not seen as a mode of lawmaking but rather a dual exercise in custom and (artificial) rationality."); Amy Coney Barrett, *The Supervisory Power of the Supreme Court*, 106 COLUM. L. REV. 324, 377 (2006) ("Modern scholars have carefully demonstrated, however, that the common law was more than a 'brooding omnipresence': It was an identifiable body of rules and customs that courts applied in the absence of a sovereign command to the contrary.").

[45] *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001) (recognizing federal common law governing the preclusive effect of a federal judgment); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (recognizing that state substantive rules may differ across federal forums).

[46] 304 U.S. 64, 78 (1938).

state substantive law and federal procedural law. If judicial estoppel is substantive, the forum state's rule may govern.

Yet the framework resolves little. The circuits disagree whether judicial estoppel is substantive or procedural, and only a minority treat it as substantive.[47] More tellingly, even some of those circuits apply the doctrine to federal issues[48]—to which "the *Erie* doctrine is inapplicable."[49]

Common law may therefore explain particular applications, but it cannot support a uniform federal doctrine with the breadth now claimed. The search for a lawful source thus ends where it began: none explains judicial estoppel in its modern form.

## III. The Missing Warrant Has Structural Consequences

That failure is not merely an academic defect; it carries structural consequences. Without a lawful source, judicial estoppel can become a rule of decision made by judges rather than supplied by governing law. The problem thus implicates both the separation of powers and the rule of law.

---

[47] Frazer, *supra*, at 1515–16 (acknowledging that most circuits do not classify the doctrine as substantive); *see also, e.g.*, *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 383 (8th Cir. 2018) (applying Missouri's judicial estoppel).

[48] *E.g.*, *Stallings*, 447 F.3d at 1046–47 (8th Cir. 2006) (FMLA case); *Slater*, 871 F.3d at 1176–77 (Title VII case).

[49] 19 Wright & Miller's Federal Practice & Procedure § 4520 (3d ed. 1998); *see also West v. Conrail*, 481 U.S. 35, 39 n.4 (1987) (holding that a "state law . . . requirement, naturally, does not apply to federal-question cases"); *Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (per curiam) ("Defining the scope of liability under state law is the State's prerogative. But a State has no power to confer immunity from federal causes of action.").

## A. Separation of Powers Requires Courts to Apply, Not Supply, the Rule of Decision

The first concern is sharpest when a judge-made doctrine defeats a claim otherwise available under governing law.

The Constitution assigns the work. Congress writes substantive federal law,[50] and it alone creates federal causes of action.[51] Federal courts, by contrast, exercise "the judicial Power"[52] by deciding cases under governing law.[53] That judicial role carries no roving commission to add claim-dispositive rules of the courts' own making.

That division makes the source question decisive. Preclusion, waiver, and traditional equitable defenses are judge-made in part, but they come with pedigrees and limits. Those features are not historical decoration; they are what separate adjudication from legislation. Madison warned that open-ended common-law discretion would give the judiciary "a discretion little short of a legislative power."[54] His warning fits a rule that disposes of a claim without grounding in enacted law, traditional equity, or necessary judicial power.

Hamilton, though often at odds with Madison over the scope of federal judicial power, made the companion point: Courts must "declare the

---

[50] U.S. Const. art. I, § 1.

[51] *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 634–35 (2021) ("We cannot create a cause of action . . . That job belongs to Congress, not the Federal Judiciary."); *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1890 (2026) ("[T]he power to create causes of action belongs to Congress.").

[52] U.S. Const. art. III, § 2.

[53] *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

[54] James Madison, *Report on the Virginia Resolutions (1800)*, *in* 4 The Debates in the Several State Conventions 546, 566 (Jonathan Elliot ed., 1836).

sense of the law," and if they instead "exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body."[55] Judgment applies law; will chooses the outcome. The distinction matters most when the result is dismissal. Whatever else divided Madison and Hamilton, they agreed on this: Article III may not supply rules that Article I never enacted.

Judicial estoppel sits uneasily with that division because it interprets no statute, rule, or constitutional provision. Instead, it often reaches back to conduct in another proceeding, before another judge, years earlier. When neither equity nor inherent power supplies the bar, the court itself has supplied the rule that decides the case. At that point, the result is not interpretation but invention—a legislative choice dressed up as an adjudicative one.

This case makes the concern concrete. Adler acquired the SBA Note after the Cash Collateral and Confirmation Orders established EDH's priority. Because those orders bind the note, they foreclose his claim.[56] The orders therefore do the work, leaving judicial estoppel as surplusage. The bankruptcy setting makes judicial improvisation especially unwarranted because the Constitution places the power to establish uniform bankruptcy law in Congress's hands.[57]

Bankruptcy nondisclosure cases reinforce the point. A debtor who omits a claim from the schedules may face Rule 9011 sanctions, modification

---

[55] THE FEDERALIST No. 78, at 437 (Alexander Hamilton).

[56] *See also* 11 U.S.C. § 1141(a) (stating that a confirmed plan binds creditors and parties in interest).

[57] U.S. CONST. art. I, § 8, cl. 4; *see also Siegel v. Fitzgerald*, 596 U.S. 464, 473 (2022) ("The Bankruptcy Clause empowers Congress to establish 'uniform Laws on the subject of Bankruptcies throughout the United States.'" (citation omitted)).

of the plan, conversion to Chapter 7, denial of discharge, and referral for prosecution under 18 U.S.C. §§ 152 and 1621.[58] Rather than a single blunt remedy, the Bankruptcy Code supplies a toolbox that can be matched to the misconduct, directed at the wrongdoer, and used to protect creditors.[59]

Judicial estoppel may invert that scheme. By extinguishing the asset, it may shrink the estate and harm the very creditors the bankruptcy process is meant to protect.[60] The Code's tailored remedies, moreover, weaken any claim that dismissal is "necessary to the exercise" of judicial power.[61]

To be clear, the Code leaves room for inherent power, but not for authority to contradict its commands. Congress has not displaced every inherent power, but the calibrated remedies it has supplied make a freestanding, claim-extinguishing rule difficult to call necessary. In bankruptcy, Congress writes the law and courts administer it.

The separation-of-powers analysis therefore returns to the source. With a lawful warrant, the concern recedes; without one, the court has made the rule that decides the case. The same source problem also generates a rule-of-law concern.

---

[58] *See Keathley*, 146 S. Ct. at 1544 (SOTOMAYOR, J., concurring) (cataloguing those tools); *see also Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 372–74 (2007) (addressing conversion to Chapter 7).

[59] *See Keathley*, 146 S. Ct. at 1544 (SOTOMAYOR, J., concurring) ("Given that bankruptcy courts can craft full remedies to alleviate any prejudice to creditors caused by a belated disclosure of a claim, it is difficult to see how using judicial estoppel to bar the debtor from pursuing a separate claim, which only harms creditors, is either needed or warranted.").

[60] *See id.*

[61] *Hudson & Goodwin*, 11 U.S. (7 Cranch) at 34; *see also Law v. Siegel*, 571 U.S. 415, 421 (2014) (holding that bankruptcy courts may not use inherent authority to contravene specific provisions of the Bankruptcy Code).

No. 25-20475

## B. The Rule of Law Permits Flexibility, Not Standardlessness

The related rule-of-law concern arises from the doctrine's indeterminacy. Equity permits judgment within recognized bounds. But flexibility does not make the absence of a principle the governing principle. *New Hampshire*, however, observed that the "circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."[62]

The distinction is between flexibility and standardlessness. Here, flexibility is layered atop uncertainty about the doctrine's source. Judicial estoppel's considerations are unweighted, the governing law is disputed, and its reach remains unsettled. Without an identified source or boundary, case-by-case judgment can easily slide into the sort of "ad hoc approach" that reaches whatever result "will make a majority of the [c]ourt happy."[63]

The circuit splits make the danger concrete. Courts cannot even agree whether judicial estoppel is procedural or substantive.[64] And the disagreement runs deeper—to the doctrine's source, governing law, required state of mind, treatment of legal positions, and consequences. When courts

---

[62] 532 U.S. at 750 (citation omitted).

[63] *Morrison v. Olson*, 487 U.S. 654, 734 (1988) (Scalia, J., dissenting); *see also* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1187 (1989) (urging that "the *Rule* of Law, the law of *rules* . . . be extended as far as the nature . . . allows"); *see generally* John F. Manning, *Justice Scalia and the Idea of Judicial Restraint*, 115 Mich. L. Rev. 747, 755 (2017).

[64] *Compare Kirk*, 887 F.3d at 383 (applying state law), *with Rissetto v. Plumbers & Steamfitters Loc.* 343, 94 F.3d 597, 603 (9th Cir. 1996) (applying federal law). Justice Thomas has called the resulting choice-of-law question "a source of deep confusion." *Keathley*, 146 S. Ct. at 1542 n.3 (Thomas, J., concurring). And commentators have further described the uncertainty. *E.g.*, N. Frazer, *supra*, at 1503; *see also* 18 Wright & Miller, *supra*, §4477.8 ("The question . . . cannot be fully answered").

disagree about nearly everything, the uncertainty is no longer peripheral to the doctrine—it *is* the doctrine.

The disagreement over legal positions is especially troublesome because while facts may be fixed, law develops. Even so, some courts apply judicial estoppel to legal theories, while others confine it to factual positions.[65] That distinction matters because legal propositions ordinarily receive different treatment from factual findings,[66] and courts may revisit legal questions across proceedings.[67] Indeed, even preclusion gives way when the legal context has changed or a new determination is needed to preserve uniform administration.[68] A rule that freezes a litigant's legal position can therefore freeze the law with it.[69]

These disagreements are not marginal; they go to the doctrine's identity. A doctrine whose source, governing law, and reach remain unsettled lacks the stability expected of a rule that can end a case. As a result, "judicial estoppel" too often tells us who loses without telling us why. That instability would be troubling even if the doctrine were necessary; here, it is not.

---

[65] *Compare Pittson v. United States*, 199 F.3d 694, 701 n.4 (4th Cir. 1999) (factual position), *with Helfand*, 105 F.3d at 535 (legal position).

[66] *See generally* 18 Wright & Miller, *supra*, § 4425 (explaining why purely legal rulings are treated differently from factual findings for preclusion purposes).

[67] *See United States v. Moser*, 266 U.S. 236, 242 (1924) (holding that the doctrine of res judicata does not apply to unmixed questions of law); *Montana v. United States*, 440 U.S. 147, 158, 161 (1979) (recognizing an exception to preclusion for "major changes" in "controlling legal principles" (citation omitted)).

[68] Restatement (Second) of Judgments § 28(2)(b) (1982).

[69] *See* Davis, *supra*, at 214 ("[W]hen a party, but for estoppel, could have argued for a change in the law, the court is deprived of this opportunity to advance the law").

## IV. Ordinary Law Supplies the Answer

If modern federal judicial estoppel has a sound foundation, I have not found it. *New Hampshire* may recognize a narrow core. Beyond that core, however, the doctrine does not clearly rest on traditional equity, necessary inherent power, or settled common law. That gap is difficult to square with the Court's instruction that equitable authority lacking historical pedigree "falls outside the bounds of a federal court's . . . authority."[70]

The doctrine's appeal is easy to understand. Courts should not be played, and litigants should not play "fast and loose" with judicial proceedings.[71] Yet a worthy end does not confer power, and misconduct does not enlarge judicial power. At bottom, the remaining defenses of the modern doctrine amount largely to judgments about how power ought to be allocated—a question the Constitution already answers.[72]

Good news: rejecting an ungrounded doctrine does not leave courts powerless. Perjury statutes, contempt, bad-faith sanctions, judicial admissions, equitable estoppel, and preclusion already address much of the same misconduct. Each has an identifiable source and defined limits. Those mechanisms may not resolve every case, but a gap in remedies is not a blank check. Before inconsistency forecloses an otherwise available claim, a court should be able to identify the law that makes it fatal.

---

[70] *CASA*, 606 U.S. at 847.

[71] *See New Hampshire*, 532 U.S. at 750 (citation omitted).

[72] *Cf. Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring) ("No persuasive defense has yet been offered for the practice."); *Perez v. Mort. Bankers Ass'n*, 575 U.S. 92, 132–33 (2015) (Thomas, J., concurring in judgment) (describing the asserted justification as "a policy judgment" about the allocation of power among the branches).

No. 25-20475

The point is not that gamesmanship must go unanswered. It is that courts should answer it through legal mechanisms whose source and limits can be named.[73]

The bankruptcy court invoked judicial estoppel. We affirm on firmer ground: the Cash Collateral and Confirmation Orders themselves foreclose Adler's claim. Nothing more is needed. JUSTICE THOMAS has called for a "closer look."[74] That look is overdue. Beyond its narrow core, judicial estoppel is entrenched in practice but unmoored in law.

---

[73] *See* Scalia, *supra*, and 1179; Manning, *supra*, at 779–80.

[74] *See Keathley*, 146 S. Ct. at 1543 (THOMAS, J., concurring).